Maurice I. MILLARD, Appellant,

v.

David W. HARRIS, Acting Superintendent, St. Elizabeths Hospital, Appellee.

No. 21492.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 16, 1968.

Decided by Judgment Entered
Nov. 8, 1968.

Opinions Rendered Dec. 12, 1968.

Mr. Armin U. Kuder, Washington, D. C., with whom Mr. David Carliner, Wash-

ington, D. C., was on the brief, for appellant.

Mr. Robert A. Ackerman, Atty., Department of Justice, with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Oscar Altshuler, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT, Circuit Judge.

BAZELON, Chief Judge:

The appellant challenges his continued commitment to Saint Elizabeths Hospital under the Sexual Psychopath Act.[1] He has been a patient there since October 17, 1962. Slightly more than a month before that date, he was charged in the old Municipal Court—now the Court of General Sessions—with indecent exposure, the maximum punishment for which was imprisonment for 90 days or a $300 fine, or both.[2] The Corporation Counsel for the District of Columbia, however, filed a statement with the court before trial stating that in addition to the allegations giving rise to the complaint "several females in the neighborhood have seen him expose himself" on other occasions. The court in response, and pursuant to the statute, directed two psychiatrists to examine Millard. The doctors reported to the court that "we have arrived at the conclusion that Maurice I. Millard is a sexual psychopath as defined in the Sexual Psychopath Statute." The court after a hearing then ordered the appellant committed to Saint Elizabeths "until he is restored to mental competence and released in accordance with the provisions of the * * * law."

The appellant has been before this Court before.[3] On that occasion we remanded the case for an evidentiary hearing to determine (1) whether the original commitment fulfilled the require-ments of the statute, (2) whether the sexual misconduct which the petitioner has or is likely to indulge in is sufficiently serious to justify commitment, and (3) whether the appellant was receiving at Saint Elizabeths the adequate psychiatric care and treatment to which we found him entitled.

Contrary to his prior representations to counsel, the appellant testified at the remand hearing that the two psychiatrists who examined him in 1962 did in fact testify at the hearing preceding his commitment. His attorney consequently no longer argues that the procedural requirements of the statute were not met. Nor does the appellant contest in this appeal the conclusion of the trial judge in the remand proceedings that Saint Elizabeths Hospital "is and has been treating petitioner." Millard does, however, vigorously challenge the finding of the court below that he "remains a sexual psychopath" as defined by the statute. Alternatively, he attacks the constitutional validity of the Sexual Psychopath Act and argues that the 1964 Hospitalization of the Mentally Ill Act[4] partially or wholly supersedes the statute. In order to resolve these entwined issues, we must examine not only the record below, but also the uncertain position of the Sexual Psychopath Act in the District of Columbia statute books and under the Constitution.

I

The Sexual Psychopath Act was enacted in 1948 as "a humane and practical approach to the problem of persons unable to control their sexual emotions."[5] Unlike the more recent legislation in a number of other jurisdictions, the statute permits proceedings for commitment as a sexual psychopath to be instituted either before or after

1. 22 D.C.CODE §§ 3503–11 (1967).

2. 22 D.C.CODE § 1112(a) (1967).

3. Millard v. Cameron, 125 U.S.App.D.C. 383, 373 F.2d 468 (1966).

4. 21 D.C.CODE §§ 501–591 (1967).

5. SENATE COMM. ON THE DISTRICT OF COLUMBIA, PROVIDING FOR THE TREATMENT OF SEXUAL PSYCHOPATHS IN THE DISTRICT OF COLUMBIA, S.REP.No. 1377, 80th Cong., 2d Sess. 5 (1948).

trial, or for that matter even when no criminal charge is pending. A person may thus be hospitalized as a sexual psychopath without ever having been convicted of even a single criminal offense. While the legislative plan was "to provide for the commitment and treatment of sexual psychopaths in a manner similar to the treatment afforded insane persons," [6] Congress was explicit in its intention to exclude insane persons from the operation of the statute:

> The term "sexual psychopath" means a person, *not insane*, who by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his sexual impulses as to be dangerous to other persons because he is likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of his desire.[7]

The exclusion of the insane, and the choice of language, was explicable in 1948. If an individual was "insane," he could be civilly committed; the commitment statute then in force spoke throughout in that language.[8] And if a criminal defendant was "insane" at the time of his offense, the "insanity defense" would excuse him from punishment.

Nor was it then senseless to invoke the medical model and provide for the hospitalization of a class of persons who were not "insane." The tendency then still extant to equate that term to psychosis and a clear break with reality resulted in a large category of persons who were not "insane," but who needed and would profit from psychiatric treatment. This Court acknowledged as much when we first encountered the statute in 1953 and found it constitu-

tional. The psychiatrist had reported that the petitioner in *Miller v. Overholser* [9] was not "insane" in the then popular use of the term:

> This man is not insane. He is of sound mind and does not display currently, any mental symptoms indicative of a psychosis. He is oriented in all fields and there are no delusions, neither are there any hallucinations.[10]

This Court, while concluding that the statute did not authorize his alleged "incarceration * * * in a place maintained for the * * * violent, criminal, hopeless insane," approved by implication commitment "in a place designed and operated for the treatment of the mentally ill who are not insane." [11]

The twenty years since 1948, however, have seen broad changes in the attitudes and language with which both lawyers and psychiatrists approach mental disturbances. In 1954 this Court reformulated the insanity defense within the District of Columbia. *Durham v. United States* [12] announced the rule that "an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." We adopted this "broader test" to escape the "misleading emphasis on the cognitive" of the M'Naghten rule [13] and to free the jury as fact-finder "to consider all information advanced by relevant scientific disciplines." [14] It was our hope thereby to allow the jury in making its moral judgments to be "guided by wider horizons of knowledge concerning mental life." [15]

In later defining a "mental disease or defect [to include] any abnormal condition of the mind which substantially affects mental or emotional

---

6. *Id.*

7. 22 D.C.Code § 3503(1) (1967) (emphasis added).

8. Act of Aug. 9, 1939, ch. 326, 53 Stat. 1299 (formerly 21 D.C.Code §§ 308–325; repealed 1964).

9. 92 U.S.App.D.C. 110, 206 F.2d 415 (1953).

10. *Id.* at 114, 206 F.2d at 418.

11. *Id.* at 115, 206 F.2d at 419.

12. 94 U.S.App.D.C. 228, 241, 214 F.2d 862, 874–875, 45 A.L.R.2d 1430 (1954).

13. *Id.* at 238, 214 F.2d at 871.

14. *Id.* at 239, 214 F.2d at 872.

15. *Id.* at 242, 214 F.2d at 876.

processes and substantially impairs behavior controls," [16] we reaffirmed in McDonald v. United States that the insanity defense should encompass the fullest inquiry into the mental condition and development of the accused. Psychiatrists participating as expert witnesses in the application of the *Durham* rule have tortured themselves to decide which of the conditions tagged by name in their taxonomy should be called a "mental illness." [17] The outcome of their efforts remains still uncertain.[18] But regardless of what a particular doctor concludes should be christened a "mental illness," clearly an accused today need not be a hallucinating psychotic to pass through the eye of the insanity defense. Whatever the current state of "the esoteric and swiftly changing vocabulary of psychiatry," [19] as we made clear in *McDonald* the definition of "mental disease" is for the purposes of the insanity defense a legal and not a medical question. "What psychiatrists may consider a 'mental disease or defect' for clinical purposes * * * may or may not be the same as mental disease for the jury's purpose in determining criminal responsibility." [20] Indeed, in our most recent effort to combat the tendency of expert witnesses to testify in conclusory fashion without discussion of the underlying facts relating to the defendant's mental condition, it was only with reluctance that we approved the continued use of the term "mental disease" in expert testimony:

[P]rohibition of testimony about "mental disease or defect" would not be a panacea. Other words and other concepts may similarly be transformed into labels. * * * At least for now, rather than prohibit testimony on "mental disease or defect," we shall try to help psychiatrists understand their role in court, and thus eliminate a fundamental cause of unsatisfactory expert testimony.[21]

The legislatively-formulated law of civil commitment has also changed in response to broadened conceptions of mental disturbances since the Sexual Psychopath Act was enacted. In 1964, after extensive hearings, Congress enacted the Hospitalization of the Mentally Ill Act[22] to replace the 1939 statute entitled "An act to provide for insanity proceedings in the District of Columbia." [23] As the name given the new legislation suggests, the term used throughout the prior legislation, "insanity," is replaced in the new act by "mental illness." The definition provided by the legislature reflects the fuller, more contextual conception of mental disturbances which has permeated our formulation and administration of the insanity defense:

"mental illness" means a psychosis or other disease which substantially impairs the mental health of a person.[24]

On the infrequent occasions upon which this Court has encountered the new statutory scheme, we have accorded the term "mental illness" a liberal construction. *In re Alexander,*[25] for example, affirmed the civil commitment of a disturbed men-

16. McDonald v. United States, 114 U.S. App.D.C. 120, 124, 312 F.2d 847, 851 (1962).

17. *See, e.g.,* Blocker v. United States, 107 U.S.App.D.C. 63, 64, 274 F.2d 572, 573 (1959); Briscoe v. United States, 101 U.S.App.D.C. 318, 322 n. 6, 248 F.2d 640, 644 n. 6 (1957).

18. *See, e.g.,* King v. United States, 125 U.S.App.D.C. 318, 320–323, 372 F.2d 383, 385–388 (1967).

19. Campbell v. United States, 113 U.S.App. D.C. 260, 277, 307 F.2d 597, 614 (1962).

20. McDonald v. United States, 114 U.S. App.D.C. 120, 124, 312 F.2d 847, 851 (1962).

21. Washington v. United States, 129 U.S. App.D.C. 29, 41, 390 F.2d 444, 456 (1967).

22. 78 Stat. 944 (1964), 21 D.C.Code §§ 501–591 (1967).

23. 53 Stat. 1299 (1939) (formerly 21 D.C. Code §§ 308–325; repealed 1964).

24. 21 D.C.Code § 501 (1967).

25. 125 U.S.App.D.C. 352, 372 F.2d 925 (1967).

tal defective with the following language:

> Although * * * the psychiatrists * * * were reluctant to label appellant's illness a psychosis, or in fact to attempt to fit it specifically into any of the various classes of mental illness recognized by the American Psychiatric Association, the thrust of their testimony was that appellant was suffering from a condition which substantially impaired his mental health, that this condition was interrelated with his mental deficiency, and that his antisocial behavior occurred as a result and manifestation of this underlying mental illness. We are satisfied, after a complete review of the record, * * * that there was sufficient evidence for the jury to find that * * * appellant was suffering from a mental illness.[26]

## II

These developments in the law pose the question of what role remains for the Sexual Psychopath Act, if indeed that statute survives at all. On the level of policy, one might well conclude that the more flexible standards now applied in the areas of the insanity defense and civil commitments leave scant need for a separate statutory scheme for sexual offenders. While the world of the "not insane" might in 1948 have included many men for whom treatment within a mental institution was more appropriate than criminal punishment, the changes in substance and semantics since then have narrowed if not eliminated the class of offenders ineligible for civil commitment or the insanity defense but still too sick to deserve criminal punishment.

■ Ours, however, is not the task to resolve such issues of policy. The Sexual Psychopath Act remains in the statute books unless the legislature has repealed it. The appellant argues that the 1964 Hospitalization of the Mentally Ill Act did just that. We are unable to agree. Congress stated explicitly in Section 19 of the 1964 Act the prior legislation repealed thereby.[27] The Sexual Psychopath Act was not mentioned. Presented with strong evidence elsewhere in the 1964 Act that the Sexual Psychopath Act was superseded, we might conclude that this was simply a *casus omissus*. Such evidence is lacking. The remainder of the new statute speaks of the "mentally ill," a broader category than those "insane" under the 1939 legislation. But in providing for the application of certain provisions of the Hospitalization of the Mentally Ill Act to those committed before 1964, Congress limited the protection of the new statute to those "declared insane or of unsound mind pursuant to a court order."[28] This, of course, would not include any persons committed previously under the Sexual Psychopath Act, since a requirement for their hospitalization was a finding that they were *not* insane.

■ Repeals by implication are not favored,[29] and whatever the strength of the arguments that the Sexual Psychopath Act should have been repealed by the 1964 Hospitalization of the Mentally Ill Act, we cannot find evidence of a legislative intent to supersede the 1948 statute. The coexistence of the 1964 Act regarding civil commitments and the Sexual Psychopath Act presents the problem, however, of determining the classes of individuals to which each applies. Before the new law, the verbal dividing line was clear, if difficult to apply: "insane" persons were eligible for civil commitment, and those "not insane" for commitment under the Sexual Psychopath Act, providing the other requirements of that statute were met.

---

26. *Id.* at 354–355, 372 F.2d at 927–928.

27. 78 Stat. 953 (1964).

28. 21 D.C.Code § 589(a) (1967).

29. *E.g.*, Amell v. United States, 384 U.S. 158, 165–166, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966); United States v. Zacks, 375 U.S. 59, 67–68, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963); Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

The categories were thus mutually exclusive, and since in Miller v. Overholser [30] we found the cutting edge of the classification, that of "sanity," a meaningful one, no problems of equal protection arose.

Today, however, we confront statutes providing for civil commitment if the person is "mentally ill and, because of that illness, * * * likely to injure himself or other persons," [31] and for commitment as a sexual psychopath if the person is "not insane, * * * [but] by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his sexual impulses as to be dangerous to other persons." [32] Our earlier discussion has shown that the class of "mentally ill" persons, as that term is understood today, includes some disturbed individuals who would have been considered "not insane" at the time the Sexual Psychopath Act was enacted in 1948. But serious problems of equal protection would arise were we to conclude that the statutes permit the Government to commit these mentally ill persons under the Sexual Psychopath Act while all other mentally ill individuals are accorded the greater procedural protections incorporated in the 1964 Hospitalization of the Mentally Ill Act.[33] While the former statute does provide for appointed counsel and a hearing at which a jury may be requested, unlike the present civil commitment law it does not assure the individual proceeded against a warning of his right to a jury determination.[34] Nor does it provide for a preliminary determination before the Mental Health Commission, which is assigned initial responsibility for civil commitments.[35] More important, perhaps, are the vast differences between the two statutes regarding release. The Sexual Psychopath Act provides merely that a person committed "may be released * * * when the Superintendent of Saint Elizabeths Hospital finds that he has sufficiently recovered so as not to be dangerous to other persons * * *." [36] The Hospitalization of the Mentally Ill Act, on the other hand, provides specifically for periodic re-examinations of the patient by one or more physicians—including, in some circumstances, one acting in his behalf—and a court hearing if the physicians disagree as to whether "the patient continues to be mentally ill to the extent that he is likely to injure himself or other persons * * *." [37]

It would indeed be strange logic to argue that the fact that a person is "mentally ill" but not so mentally ill as to be "insane" as that word was understood in 1948 justifies withholding from him the protections of the civil commitment law. Nor can we conceive of any rational reason for shading the procedural rights incident to commitment and release simply because the person's dangerous proclivities manifest themselves in the form of sexual misconduct. Certainly no one has ever argued, for example, that in the context of a criminal prosecution an alleged rapist is entitled to less protection of his right to a jury trial than an accused murderer.

It might be argued that to avoid these problems the procedural protections of the civil commitment law should be read into the Sexual Psychopath Act. But while this Court has in some contexts interpreted other statutes dealing with the mentally ill in a manner to harmonize the overall statutory framework in the District of Columbia and thereby avoid constitutional prob-

30. 92 U.S.App.D.C. 110, 206 F.2d 415 (1953).

31. 21 D.C.Code § 545 (1967).

32. 22 D.C.Code § 3503(1) (1967).

33. See Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

34. Compare 22 D.C.Code §§ 3505, 3507 (1967) with 21 D.C.Code §§ 543, 545 (1967).

35. See 21 D.C.Code §§ 542, 544 (1967).

36. 22 D.C.Code § 3509 (1967).

37. 21 D.C.Code §§ 546–549 (1967).

lems,[38] there are limits to this process. As we said in Cameron v. Mullen,[39] quoting from the Supreme Court decision in Aptheker v. Secretary of State,[40]

It must be remembered that "[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute * * *" or judicially rewriting it.

The problem here is similar to that faced in *Mullen*. The appellant there had been committed to Saint Elizabeths Hospital by the Court of General Sessions after an acquittal by reason of insanity. Mrs. Mullen had been charged with the misdemeanor of simple assault, and the insanity defense had been raised by the court over her objection. We agreed with the District Court where she filed a petition for a writ of habeas corpus that the statute [41] did not empower the trial court to so commit the appellant. An integral part of our reasoning was our conviction that "under the logic of the Supreme Court's recent decision in Baxstrom v. Herold, * * * serious constitutional doubts would attend any construction of Subsection (a) which authorized post-verdict indefinite confinement" without the protections of the civil commitment statute.[42]

We were unable for two reasons to agree with the Government's argument that the trial judge had obviated these problems by holding a hearing such as the civil commitment law provides and instructing the hospital to apply civil release standards. First, "to import all of the civil commitment standards into Subsection (a), * * * we would have to rewrite completely that section." [43] Second, since the Hospitalization of the Mentally Ill Act entrusted exclusive jurisdiction over civil commitments to the District Court,[44] we would have to rewrite that statute as well to authorize a judge of the Court of General Sessions "to impose conditions reserved for civil commitment proceedings. * * *[45]

The problems are identical here. To harmonize the Sexual Psychopath Act with the procedural aspects of the civil commitment statute not only would we need to rewrite the former legislation, but also, since the Sexual Psychopath Act may be invoked in the Court of General Sessions and the Juvenile Court as well as the District Court,[46] we would have to confer jurisdiction upon those courts reserved by Congress to the District Court.

We therefore cannot avoid the constitutional problems that arise if the Sexual Psychopath Act can be applied to mentally ill persons by importing civil commitment standards. And consequently we conclude that to avoid these problems we must construe the words "not insane" in the sexual psychopath statute to mean "not mentally ill," as indeed the Government conceded we should at the oral argument of this case.

### III

Having done so, however, we must examine the Sexual Psychopath Act when so interpreted. The statute defines a "sexual psychopath" as

a person, not insane, who by a course of repeated misconduct in sexual matters has evidenced such lack of power

---

38. *See* Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968); Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1966).

39. 128 U.S.App.D.C. 235, 245, 387 F.2d 193, 203 (1967).

40. 378 U.S. 500, 515, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964).

41. 24 D.C.Code § 301(a) (1967).

42. 128 U.S.App.D.C. at 241, 387 F.2d at 199.

43. *Id.* at 245, 387 F.2d at 203.

44. 21 D.C.Code § 501 (1967) defines "court" for purposes of civil commitment as "the United States District Court for the District of Columbia."

45. 28 U.S.App.D.C. at 245, 387 F.2d at 203.

46. 22 D.C.Code § 3503(2) (1967).

to control his impulses as to be dangerous to other persons because he is likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of his desire.[47]

When "insane" is read to mean "mentally ill" in the broad sense that term has come to be used in the statutes and court decisions of this jurisdiction, a serious question arises whether its language is not so meaningless or self-contradictory as to be constitutionally infirm. Specifically, the problem is whether a person who by a pattern of repeated sexual misconduct has demonstrated himself sufficiently dangerous to meet that part of the statutory definition is not, as a definitional matter, mentally ill and therefore outside the statutory definition.

The medical and legal literature is voluminous which deals with the personality problems that lead to sexual recidivism.[48] We have no doubt that a large proportion of such offenders are mentally ill in the broad sense that their behavior is affected by their personality problems and that psychiatric treatment would be more appropriate for them than the traditional mechanisms of deterrence or simple restraint. Evidence of such repeated misconduct would certainly be relevant to a jury determination of the issue, and in light of *McDonald* and *Alexander* we have difficulty imagining circumstances where we would be compelled to reverse a finding of mental illness premised upon such evidence.

However, to strike down the Sexual Psychopath Act as meaningless and self-contradictory, we would need to go further. It is not enough that most sexual recidivists may be mentally ill in some appropriate sense of that difficult concept. Nor is it sufficient that we would have difficulty reversing a determination by a jury or other fact-finder that such

an offender was mentally ill. Nor would it even be sufficient to find from the record in this case that the appellant is mentally ill, as the only expert who spoke directly to the question testified. To conclude that the statute is meaningless, we would need to find that the intersection of the class of dangerous sexual recidivists and the class of not mentally ill persons is the null set—*i. e.*, that there is no person who is a dangerous sexual recidivist but who is not mentally ill.

This we are reluctant to do. The decisions of this court have consistently emphasized that determinations of mental illness are to be made on a case-by-case basis, with individualized attention paid to the personality of the person involved, his past behavior and present conflicts. To establish a sweeping rule that all dangerous sexual recidivists are ipso facto mentally ill would stand in direct contradiction to this principle. Our doubts concerning the number of men whose conduct would place them within the Sexual Psychopath Act but who are not mentally ill may lead us to question the wisdom of or need for the statute. The changes in our approach to mental disturbances since 1948 have sorely dated the humanitarian impulses which gave rise to the legislation, even if the impulses were well considered then. But the implications in other areas of declaring as a matter of law that all individuals guilty of repeated sexual misconduct are mentally ill render us loath to take this step until we have examined all other possible dispositions of this case.

It would be necessary to strike down the legislation in this case only if we found the statute applicable to the appellant. Regardless of whether Millard is mentally ill or not, the statute is not applicable to him unless his past sexual misconduct enables us to conclude that his likely dangerousness places him within the statutory definition.

---

47. 22 D.C.Code § 3503(1) (1967).

48. *See, e.g.*, C. ALLEN, A HANDBOOK OF PSYCHOSEXUAL DISORDERS (1962); B. KARPMAN, THE SEXUAL OFFENDER AND HIS OFFENSES, ETIOLOGY, PATHOLOGY, PSYCHODYNAMICS AND TREATMENT (3d ed.1957); F. T. LINDMAN & D. M. McINTYRE, JR., THE MENTALLY DISABLED AND THE LAW 298–313 (1961).

## IV

In scrutinizing this question, we begin with the premise that when "not insane" is read to mean "not mentally ill" the sole justification for commitment under the sexual psychopath statute is his dangerousness to others. Since that is true, we must view the statute realistically as one which borders close upon preventive detention—detention which under our statute does not even require prior conviction of a criminal act.

When the statute is evaluated in that light, constitutional issues of the gravest magnitude immediately appear. Substantively, there is serious question whether the state can ever confine a citizen against his will simply because he is likely to be dangerous in the future, as opposed to having actually been dangerous in the past. Since such a prediction of likely dangerousness can only be premised upon past behavior, there are closely related procedural questions concerning the proof of past conduct. When a person is being committed to a mental hospital not because he is mentally ill but only because his past conduct allegedly demonstrates his likely dangerousness, we have great difficulty imagining how the full protection of the self-incrimination privilege and the right to confront and cross-examine witnesses could constitutionally be denied him.[49] The Supreme Court has demonstrated no intention to be led astray in such circumstances by a legislative label that such proceedings are "civil" rather than "criminal."[50] When the proceeding "is closely related to the behavior of the person rather than to his mental condition considered apart from his behavior," as the Government in its brief describes proceedings under the Sexual Psychopath Act, the constitutional guaranties implicit in due process of law must come into play.

On this score also the Sexual Psychopath Act appears vulnerable. But we would need to examine whether the procedural requirements of the statute meet constitutional standards only if the statute is, as an initial matter, applicable to the appellant. We therefore must first consider the question of whether the appellant falls within the statutory definition of a sexual psychopath.

## V

Predictions of dangerousness, whether under the Sexual Psychopath Act or in some other context, require determinations of several sorts: the type of conduct in which the individual may engage; the likelihood or probability that he will in fact indulge in that conduct; and the effect such conduct if engaged in will have on others. Depending on the sort of conduct and effect feared, these variables may also require further refinement. Our evaluation of the ultimate dangerousness of certain forms of behavior may vary with the frequency with which they can be expected. If so, it will be necessary to evaluate not only the likelihood that the individual will misbehave in such fashion, but also the probability that he will offend with a certain frequency. And since the effect on others may depend on who the victim is, an estimate of the likelihood that a certain sort of person may prove the victim may also be necessary.

Each and all of these determinations may well be difficult, as this case demonstrates. But an examination of all aspects of the problem is essential. Because the court below short-circuited the analysis we find required, we cannot accept its ultimate conclusion that the appellant "by his sexual misconduct, is likely to inflict injury, loss, pain or other evil on others." A plethora of evidence was introduced at the remand proceedings, however, and on the basis of this full exploration of the appellant's personality and problems we are able to conclude that he has borne his burden in this habeas corpus proceeding to show

---

49. *Cf.* Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

50. *See id.* at 608, 87 S.Ct. 1209.

by a preponderance of the evidence [51] that his continued confinement as a sexual psychopath is not justified under the statute as we have construed it.

Five psychiatrists testified at the hearing concerning the appellant's dangerousness. Dr. Weickhardt, the appellant's former physician at Saint Elizabeths Hospital, stated that he agreed with the diagnosis made at the hospital in October 1962 when Millard was first committed: the appellant was not and is not psychotic, but suffers from a personality disorder categorized as a "passive-aggressive personality, passive-dependent type, exhibitionism." None of the remaining expert witnesses criticized this diagnosis. All of the witnesses testified that the appellant is unable to enter into a mature relationship with women. The sexual misconduct which precipitated the 1962 commitment, exhibitionism, is the product of this difficulty. The psychiatrists testified that, when he was experiencing difficulties with his marriage, Millard would react by exhibiting himself in public, and sometimes masturbating. On occasion the triggering event for his misconduct would be some other disturbing occurrence, such as the loss of his job. But even in these cases, according to the expert testimony, the appellant would exhibit himself not because of his distress at losing his job, but because he felt that such a setback led his wife to regard him as less a man.

Concerning the appellant's exhibitionism in public places before his commitment in 1962 there seems little dispute. There was also some evidence in the hospital records that Millard admitted to assorted acts of voyeurism before his marriage. On the stand, however, he denied having been a peeping tom since then. Although there was testimony that voyeurism and exhibitionism are frequently associated, at least one psychiatrist, Dr. Dabney, testified that the two did not seem "tied up" in Millard's case.

Shortly after Millard was committed in 1962, his wife told a social worker that the appellant had walked around naked in his home in the presence of his small children, holding his penis in his hand. Although the appellant denied ever having done so, and although neither his wife nor even the social worker have ever testified in any of the proceedings related to the appellant's commitment, this alleged incident played a prominent and repeated role in the expert testimony at the remand hearing.

The hospital records contain no evidence that Millard has exhibited himself since becoming a patient at Saint Elizabeths. Nor were any of the three doctors from Saint Elizabeths aware of any such misconduct by the appellant. Millard himself denied any such acts while in the hospital. Nevertheless, although the testifying psychiatrists spoke with varying degrees of certainty, the majority agreed that since the appellant still suffers from the same personality disorder, he would, if released, be likely to exhibit himself in public at times of stress. In explaining why they felt that the appellant would revert to his old ways once released despite almost six years of apparent good sexual behavior in the hospital, the psychiatrists spoke both of the close supervision at the hospital and the appellant's lack of opportunity while there to encounter the same tension-producing difficulties with women in general and his wife in particular that precipitated his misconduct before his commitment.

The record contains no allegations that appellant has ever committed a violent sexual offense, and the testifying psychiatrists agreed that because of "the lack of aggressiveness, inferiority, timidity and heterosexual immaturity of the [typical] exhibitionist," such individuals are markedly less likely to commit violent sexual crimes than other types of sexual offenders.

There was also testimony drawn from the hospital records concerning various

---

51. *See* Bolton v. Harris, 130 U.S.App.D.C. 1, 12, 395 F.2d 642, 653 (1968).

aggressive acts of a non-sexual nature allegedly committed by the appellant. The most serious of these was said to have occurred while Millard was on city parole from the hospital in November 1964. He had purchased a used car and became angry when the seller refused to refund his money after the car broke down. The hospital received a complaint from the husband of the saleswoman, who said that Millard had come to his house on Halloween night, said "Trick or treat," and thrown a solution of lye through the open doorway, some of which struck the complainant in the eye. Millard has consistently denied having done this.

There was also evidence in the hospital records that the appellant had struck a salesman visiting his home about the same time with a window screen. His city parole privileges were revoked and the appellant returned to the hospital because of a third incident, in which he became involved in a squabble at his home and allegedly slapped his sister-in-law because he felt she was intruding into a private domestic dispute.

The doctors from Saint Elizabeths also testified to certain aggressive acts by the appellant while in the hospital. He once slapped a considerably smaller patient because, as Millard told the doctor, "the man wouldn't let me go into the water section [bathroom]." On other occasions the appellant was said to have violated ward rules by changing television channels without the consent of the other patients; because of Millard's impressive physical size, the other patients were supposedly too intimidated to object.

The testifying psychiatrists viewed these aggressive but non-sexual acts as a manifestation of the same passive-aggressive personality disorder which led to his exhibitionism and earlier voyeurism. As Dr. Weickhardt, for example, stated:

[I]n reaction to trivial challenges to self-esteem, he becomes impulsive. In other words, he acts without thinking of the consequences of his acts. And he does this in two ways. With men, particularly, he acts aggressively, and he may even become violent physically. With women he has felt ill at ease, afraid of intimate relationship; and therefore he tends to expose himself or to masturbate so that women could see him.

I think that this reaction with men and with women is part of the same thing; that with both the behavior is sort of a defense against reaching the intimacy for which he really is longing. I think he longs for an intimate sort of relationship with people, but yet he is sort of afraid of it.

■ Were this a case involving civil commitment, such a rounded view of the individual's personality and past behavior would of course be essential both to a determination of whether he was mentally ill and, if so, whether his condition would cause him to be dangerous to himself or others. But since the petitioner has been committed as a sexual psychopath, our sole concern is the likelihood that he would if released be dangerous to others because of *sexual* misconduct.

■ The Act speaks plainly of "misconduct in sexual matters," and our doubts concerning the constitutional validity of the sort of preventive detention implicit in the statute certainly do not permit us to broaden the words of the act. As a corollary, moreover, we must read "sexual" in the common meaning of that term in considering what acts may be considered in applying this statute.

Similarly, the appellant's mental disorder is not in itself even a partial justification for his commitment, for the reasons discussed earlier in this opinion. The testimony regarding the appellant's aggressive acts toward men, and the evidence it presents to confirm the diagnosis of a passive-aggressive personality, is therefore relevant only to a determination of his dangerousness because of probable sexual misconduct. In this regard, the appellant's alleged history of

aggressiveness toward men might, despite the apparent general timidity of exhibitionists in the heterosexual sphere, affect the likelihood that Millard might commit a violent sexual assault. In response to such a question, for example, Dr. Cameron replied:

Assuming the facts as you have stated them, a person who masturbates while exhibiting himself * * * might be more likely to indulge in an assault at some other time. If there is a history of throwing lye or some other aggressive act—superficially, at least, a non-sexual act—then one would have to believe that the person was capable of aggression and we would be more concerned about sexual aggression. * * *

Concerning the likely effect of the appellant's exhibitionism on others, psychiatrists agreed that the effect would vary with the viewer. Most women would find the act repulsive, but their distress would be brief. Dr. Owens testified that some women might find such conduct amusing; he declined to concur in the trial judge's "layman's diagnosis" that any women who laughed "is sick." The consensus of the expert witnesses was that a highly sensitive woman would be more shocked, and that a "very seclusive, withdrawn, shy, sensitive suspicious" woman might become "quite upset." But even in that case, the effect would be for only "two or three days." There was no evidence presented of any actual harm to adult women from the appellant's past exhibitionism.

Dr. Weickhardt did testify, however, that one viewer had suffered "serious psychological harm"—the appellant's son Darrell, who was six years old at the time of the appellant's commitment in 1962. His conclusion was based, not on any independent examination of the boy, but upon an evaluation report of a child health center where Darrell was treated in 1966. On cross-examination, however, Dr. Weickhardt admitted,

There's nothing in this report that shows that Darrell suffers because of his father's sexual behavior, but the report does show that Darrell has an emotional problem which is in part due to his relationship with his father.

The examination continued,

Q. * * * Now, is it not a fairer inference, Dr. Weickhardt, that the child, Darrell, suffered because of rejection by his father, by virtue of being a scapegoat, rejection and being physically abused, than the inference that you drew that his problem is due in part to the exhibitionism of his father?

A. It's my view that all of these things are so interrelated that you can't really attribute injury to any one of them.

We sympathize with the psychiatrist's reluctance, indeed inability, to compartmentalize the father's relationship with his son and evaluate the damage done by the former's sexual misconduct, if any. But, unfortunately, such compartmentalization is required by the Sexual Psychopath Act. The legislation provides for the institutionalization of individuals who are dangerous to others because of their sexual misconduct, not for the hospitalization of fathers who traumatize their children by a general pattern of rejection and abuse. If the effect of alleged sexual misconduct cannot be separated out, the solution in applying the statute is not to heap together all the unhappy effects of an unhealthy parent-child relationship as evidence of the harm produced by "sexual misconduct."

## VI

In an opinion written after the completion of the hearing held in response to our earlier remand of this case, the trial court summarized at some length the evidence presented by each of the psychiatrists who testified concerning the appellant's dangerousness to others. In doing so it recited without distinction the evidence related to past sexual misconduct toward women and the alleged aggressive acts toward men. The opinion also speaks of the "serious psychological harm" suffered by the child "whom petitioner physically abused

and rejected and before whom petitioner [was alleged by his wife as reported by a social worker to the psychiatrist who testified at trial to have] paraded in the nude holding in his hand his genital organ." Here also the court below failed to distinguish between dangerousness due to sexual misconduct and dangerousness due to other behavior. For these reasons we are unable to accept the conclusion of the trial court that, "After weighing all of the evidence in this case I conclude that if petitioner were to be released at this time * * * he, by his sexual misconduct, is likely to inflict injury, loss, pain, or other evil on others."

We find the analysis of the trial court erroneous, or at least incomplete, on another score as well. In the final paragraph of its discussion of the appellant's dangerousness, the court summarized the expert testimony,

> Except for Dr. Dabney's opinion * *, all witnesses * * * are of the opinion that petitioner, through his public exhibitionism and masturbation, would likely inflict injury, loss, pain or other evil on one type of individual or another without physical contact. Some women viewers would be psychologically affected as would small children viewers. Since petitioner's misconduct has been in the public such women and children are "potential viewers."

Implicit in this reasoning is the assumption that the mere fact that some such women and children are among the "potential viewers" of the appellant's expected exhibitionism if released is enough to justify the ultimate conclusion of likely dangerousness. But the requirement for commitment for dangerousness is not the mere possibility of serious harm, but its likelihood. The trial court made no effort to evaluate the probability, as opposed to the possibility, of such harm. We recognize the difficulty of such determinations. But the fact that Millard in this habeas corpus proceeding must bear the burden of showing that he does not fall within the statutory definition of sexual psychopathy does not imply, as the Government suggests, that he must demonstrate that it is "certain or highly probable that appellant, if released, would not again publicly expose and masturbate * * * [or] that if he did so, children or delicate adult women could not be among the potential viewers." Rather, to bear his burden of proof the petitioner for a writ of habeas corpus must show only that his past behavior, viewed under the illumination provided by psychiatric evaluation of those actions, does not justify the conclusion that he falls within the statutory definition of one who is *likely* to inflict injury on others.

Because the trial court failed to distinguish between sexual and nonsexual misconduct as a justification for commitment and also failed to evaluate the likelihood as opposed to the mere possibility of sexual misconduct, we must reverse its decision to dismiss the appellant's petition for a writ of habeas corpus. We are, however, reluctant to remand this case for yet a third hearing on a petition originally filed more than three years ago, especially since we have difficulty envisaging a more thorough presentation of expert testimony than was adduced in the hearing just concluded. In view of the unusual circumstances of this case, therefore, we have ourselves scrutinized the record and find that we can conclude that the appellant has borne his burden to show by a preponderance of the evidence that he is not now, if he ever was, a sexual psychopath within the statutory definition. Limiting ourselves to an evaluation of the likelihood of sexual misconduct, we find that the appellant is unlikely to engage in sexual misconduct other than exhibitionism. As for the possibility that Millard may expose himself and perhaps masturbate in public, we do not conclude that he is unlikely to do so. We do find from the testimony of the Saint Elizabeths psychiatrists that the appellant's self-control and insight into his personality shortcomings have improved sufficiently to permit the conclusion that such mis-

conduct is likely to occur infrequently and only at times of stress. For six years the appellant has not deen detected exposing himself, although the witnesses testified he did encounter women at Saint Elizabeths. It may be true that the limbo of hospital life prevented the sort of tensions toward women that have plagued appellant in the past from building up. But by the same token it was by the Government's choice, and not his, that he has had no greater opportunity to prove his self-control. The fact that he has successfully resisted the limited temptations placed before him supports the testimony of Dr. Miller, who appeared on the appellant's behalf, that the fear of punishment (and perhaps a now internalized sense of self-control) will reduce the likelihood of future sexual misconduct.

The unanimous testimony of all the expert witnesses that serious psychological harm would result from public exposure only to unusually sensitive adult women and small children leads us to conclude that the future sexual misconduct of the appellant, if any, is not sufficiently likely to cause the sort of harm required by the statute to justify further commitment. The appellant did not, it is true, prove that no such "potential viewers" would view him in the course of any future exhibitionism. But having shown that he was unlikely to commit such acts with great or uncontrollable frequency, and that in the event of such misconduct harm would be produced in only a small proportion of the population, the appellant could fairly demand of the Government that it show that the members of these restricted classes were not merely "potential viewers," but likely viewers. This the Government wholly failed to do. And without the assistance of any evidence adduced on this score, we cannot conclude that supersensitive women and small children are likely to suffer serious harm from isolated instances of exhibitionism. "Very seclusive, withdrawn, shy,

sensitive" women are a minority. While the law must and does protect them like other citizens, there are limits on the extent to which the law can sweep the streets clear of all possible sources of occasional distress to such women. Small children present a different problem. But the expert testimony was not that the typical small child would be injured by witnessing an isolated act of exposure on the part of a stranger, but rather that psychological danger to their development was likely from repeated exposure to such abnormal adult sexual behavior. We therefore conclude that the likelihood of serious injury to a child happening to see the appellant expose himself in public is too remote to justify commitment. As for harm to the appellant's own children, we have already adverted in passing to the questionable nature of the sole evidence that the appellant ever did expose himself in his home before them. Even if we accept this evidence, however, and assume that the appellant might expose himself in his home if released, his children can be protected from the harm which might follow from repeated exposure by other means than his involuntary hospitalization. His wife need not permit the appellant to so abuse his children, and other legal remedies are available to her to insure that he does not inflict such harm on his children.

Reversed and remanded for proceedings in accordance with this opinion.

Reversed.

J. SKELLY WRIGHT, Circuit Judge (concurring):

I concur in the result in this case, and in Chief Judge Bazelon's opinion as far as it goes. However, I think his opinion does not go far enough, and accordingly I set forth my own views.

In 1948 Congress enacted the Sexual Psychopath Act [1] under which in 1962 Maurice Millard was committed. The key definitional section of that statute defines a sexual psychopath as

---

1. 62 STAT. 347 (1948), 22 D.C.CODE §§ 3501–3511 (1967).

"a person, *not insane,* who by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his sexual impulses as to be dangerous to other persons because he is likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of his desire." 22 D.C. CODE § 3503(1). (Emphasis supplied.)

The 20 years that have passed since this statute was enacted have seen dramatic changes in the state of psychiatry and the related law. It is incumbent upon us to construe this statute in light of these changes.[2]

When the statute is so construed, I find the following: (1) The term "not insane" in the statute means "not mentally ill," and "mentally ill" is to be taken in the broad legal sense defined by this court in McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847 (1962) *(en banc) (per curiam).* (2) The lack of power to control sexual impulses described in the statute means something more than mere strong sexual propensities; it refers to persons who evidence "an utter lack of power to control their sex impulses and * * * are likely to * * * inflict injury * * * on the objects of their uncontrolled and uncontrollable desire."[3] And (3) in light of recent psychiatric opinion, it appears that a "sex psychopath" lacking the impulse control described in the statute must come within the legal definition of mental illness.

Therefore, since the statute limits its application to persons not mentally ill,

it cannot apply to Millard or to any other sex psychopath described therein. Thus the medical and legal developments over the last 20 years have rendered the Sexual Psychopath Act self-contradictory and meaningless.

I

When the Sexual Psychopath Act was enacted in 1948 there was a fairly clear separation between the terms "insane" and "mentally ill." The criterion for commitment under the general civil commitment statute at that time was that a person be insane.[4] And, of course, insanity was also the ground for relieving a person of criminal responsibility. Insane persons were taken to be a narrower group than the general class of people who were mentally ill. Thus in 1953 this court, in Miller v. Overholser, 92 U.S.App.D.C. 110, 115, 206 F.2d 415, 419 (1953), referred to the "treatment of the mentally ill who are not insane," holding that they were committable under the Sexual Psychopath Act.

By 1964 major changes had taken place, blurring the difference between mental illness and insanity. The criterion for commitment under the new civil commitment act[5] became mental illness. This followed the development in the criminal law, as seen in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), and McDonald v. United States, *supra,* which made mental illness the test for relieving a person of criminal responsibility. The result of these developments is, as the Government conceded at oral argument,[6] to require that the Sexual Psychopath Act be construed to apply to

---

2. *See, e.g.,* Bolton v. Harris, 130 U.S.App. D.C. 1, 395 F.2d 642 (1968).

3. Minnesota ex rel. Pearson v. Probate Court of Ramsey County, 309 U.S. 270, 273, 60 S.Ct. 523, 525, 84 L.Ed. 744 (1940).

4. 21 D.C.CODE § 315 (1961).

5. 21 D.C.CODE § 545(b) (1967).

6. This concession was required because a mentally ill person committed under the 1964 civil commitment act is entitled to a whole raft of procedural safeguards,

as well as fairly narrow grounds for obtaining his release. *See, e.g.,* 21 D.C. CODE § 543 (preliminary determination by Commission on Mental Health) ; § 544 (notification in writing of right to jury trial) ; §§ 546, 548 (periodic examination; release criteria). These protections are not available to the person committed under the Sexual Psychopath Act. Thus if the latter act were held to apply to a person mentally ill, the differential treatment accorded to such mentally ill persons would raise evident equal protection problems.

those not mentally ill, rather than those "not insane."

Mental illness is defined in the 1964 civil commitment act as "a psychosis or other disease which substantially impairs the mental health of a person." 21 D.C. CODE § 501 (1967). Mental disease (or defect) is the criterion established in *Durham* for relieving criminal responsibility. In *McDonald* we gave a legal definition for mental disease or defect:

> "mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavioral controls. * * * " 114 U.S. App.D.C. at 124, 312 F.2d at 851.

This broad legal definition was applied to the term mental illness for commitment under the 1964 act in In re Alexander, 125 U.S.App.D.C. 352, 354–355, 372 F.2d 925, 927–928 (1967).[7]

## II

The District of Columbia Sexual Psychopath Act was passed to conform to the Supreme Court's construction of Minnesota's sex psychopath law. In Minnesota ex rel. Pearson v. Probate Court of Ramsey County, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940), the Minnesota act had been attacked on constitutional grounds as vague and uncertain. In rejecting this claim, the Supreme Court approved the construction of the act given by the Minnesota courts:

> " * * * [T]he act is intended to include those persons who, by an *habitual course of misconduct in sexual matters,* have evidenced *an utter lack of power to control their sexual impulses* and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of *their uncontrolled and uncontrollable desire.* It would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities. * * * " 309 U.S. at 273, 60 S.Ct. at 525. (Emphasis added.)

As shown by the Senate Committee Report,[8] the District of Columbia Act's definition was intended to mean the same as the court construction of the act in *Pearson.* Any doubt on this score[9] was settled as long ago as 1953, when we said:

> " * * * The draftsman of our local act wrote into it not the terms of the Minnesota statute but the interpretation of it which the Supreme Court approved." Miller v. Overholser, *supra,* 92 U.S.App.D.C. at 113, 206 F. 2d at 417. (Footnote omitted.)

The District of Columbia Sexual Psychopath Act, therefore, applies to persons who have evidenced a repeated pattern of utterly "uncontrolled and uncontrollable" sexual impulses driving them to harm others. The question then presented is: considering the present state of medical learning and legal definition of mental illness, is the sex psychopath described in the District of Columbia statute mentally ill as a matter of law

7. "Although it is true that the psychiatrists in this case were reluctant to label appellant's illness a psychosis, or in fact to attempt to fit it specifically into any of the various classes of mental illness recognized by the American Psychiatric Association, the thrust of their testimony was that appellant was suffering from a condition which substantially impaired his mental health, that this condition was interrelated with his mental deficiency, and that his antisocial behavior occurred as a result and manifestation of this underlying mental illness. We are satisfied * * * that there was sufficient evidence for the jury to find that * * * appellant was suffering from a mental illness. * * * "

8. "Sexual psychopath is defined substantially in the language used by the Minnesota Supreme Court in interpreting the definition of the Minnesota statute. This interpretation was accepted by the Supreme Court of the United States in Minnesota ex rel. Pearson v. Probate Court, *supra.* * * * " S.Rep.No. 1377, 80th Cong., 2d Sess., p. 6 (1948).

9. *See* Lomax v. District of Columbia, D.C. C.A. 211 A.2d 772 (1965).

and therefore outside the coverage of the Act?

## III

In the area of determining whether a person is mentally ill for the purpose of relieving him of criminal responsibility, this court has always given great deference to the jury. This is a recognition that the area of criminal responsibility is, to a great degree, a reflection of community values, held in light of medical and other knowledge and exposure to particular problems. However, even in this traditional jury area we have said that it may be appropriate for a court to direct a verdict as a matter of law that a person is not guilty by reason of insanity. Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960); Satterwhite v. United States, 105 U.S.App.D.C. 398, 267 F.2d 675 (1959); Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878 (1957); Wright v. United States, 102 U.S.App. D.C. 36, 250 F.2d 4 (1957); Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52 (1956); *and see* Brock v. United States, 5 Cir., 387 F.2d 254 (1967).

In this case we are not dealing with the area of criminal responsibility. And we do not have to decide the issue of causation—whether a person's act was the product of his disease. Rather, Congress has defined a type of person it intended for commitment. It is appropriate for this court to match the judicial construction of the two central parts of this definition—"not insane" and "lack of power to control his sexual impulses," both of which must be satisfied before the Act can be applied—to see whether the statute as a matter of law is self-contradictory. If the state of medical knowledge were substantially ambiguous, or if the development of the law relating to mental illness had not progressed as far as it has, I would permit the statute to stand (and allow the jury to search for those people coming within the Act). However, after examining the authorities we can say with reasonable certitude that persons evidencing the kind of lack of control called for by the statute must of necessity come within the legal definition of mental illness.

The problem is narrow. The statutory language, "a course of repeated misconduct in sexual matters" and "lack of power to control his sexual impulses," obviously comes within that part of the *McDonald-Alexander* definition dealing with substantial impairment of behavior controls. The only question, then, is whether such persons also suffer from the other requirement of *McDonald-Alexander,* an "abnormal condition of the mind." I shall look to two sources to see if this latter condition is met: (1) medical literature, and (2) the experience of St. Elizabeths Hospital with this statute in general and with Maurice Millard in particular.[10]

---

10. I note that frequently in the literature and in the discussions of psychiatrists, mental problems are referred to as mental disorders. Perhaps at one time it would have been appropriate to hassle over whether a disorder is really an illness. I think we are now beyond that. The term disorder is used to encompass a broad variety of mental ills, ranging from psychoses to character defects. In any functional sense the term clearly refers to illness in the meaning appropriate here—an abnormal mental condition for which medical treatment is felt to be appropriate. Thus the standard manual for diagnosis used by psychiatrists, the American Psychiatric Association's DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (2d ed. 1967), reflects this approach. Schizophrenia and other psychoses are listed as mental disorders, along with non-psychotic conditions. And that the MANUAL is designed to aid doctors in dealing with sick people is clear:

"In publishing the Manual the Association provides a service to the psychiatrists of the United States and presents a nomenclature that is usable in mental hospitals, psychiatric clinics, and in office practice. It has, in fact, a wider usage because of the growth of psychiatric work in general hospitals, both on psychiatric wards and in consultation services to the patients in other hospital departments, and in comprehensive community mental health centers. It will also be used in consultations to courts and industrial health services."

MANUAL, *Foreword*, p. viii.

### A. *Medical Literature*

As early as 1950 the Group for the Advancement of Psychiatry, in its Committee on Forensic Psychiatry, studied this area. Its report, PSYCHIATRICALLY DEVIATED SEX OFFENDERS *(Report No. 9, 1950)*, recommended that repetitive sex offenders be treated as mentally ill. Relevant here are the criteria recommended by the Committee for psychiatrists to use in determining whether a sex offender is mentally disordered. The criteria included:

"1. Repetitive Compulsive Acts

Repetitive compulsive acts having a (dynamic) pattern of similarity and carried out to the point of community intolerance. Such acts manifest heedless disregard of consequences and seek and attain ultimate expression even if momentary obstacles are encountered.

"2. Forced Relations

The forcing of sexual relations implies non-compliance on the part of the offended party. Forced relations may be either hetero- or homosexual." *Report*, p. 2.

In 1954 Dr. Benjamin Karpman, then Chief Psychotherapist at St. Elizabeths Hospital, published his book THE SEXUAL OFFENDER AND HIS OFFENSES, ETIOLOGY, PATHOLOGY, PSYCHODYNAMICS AND TREATMENT (1954). Dr. Karpman examined sexual deviancy from a psychoanalytic or psychogenic viewpoint. He discussed sexual deviancy by reference to the morally neutral term paraphilia, including among the paraphilias pedophilia, homosexuality, exhibitionism and voyeurism, frottage and fetishism.[11] Dr. Karpman noted:

"* * * Modern psychiatry * * has come to recognize that these are not degeneracies, but illnesses in the full sense of the word, having specific etiologies and courses, and as being fully amenable to treatment as are other psychic diseases. * * *" P. 384.

Paraphilia is seen as akin to neurosis:

"Thus, when viewed in terms of genetic dynamics, paraphilias and neuroses are * * * sisters under the skin and basically the same. Paraphilias are neuroses in every sense of the word as measured by the usual standards with which we commonly evaluate neuroses. * * * Like neuroses they are the results of lifelong, thwarted development * * *." P. 388.[12]

---

11. Experience with a statute such as the District of Columbia's (which excludes persons charged with rape) is that exhibitionists and pedophiles form the bulk of persons committed under the statute, with some frotteurs and some overt homosexuals who make repeated public advances also included. For example, the reported cases under the statute showed: the present case (exhibitionist); Clatterbuck v. Overholser, 107 U.S.App.D.C. 340, 278 F.2d 20 (1960) (pedophile); Miller v. Overholser, 92 U.S.App.D.C. 110, 206 F.2d 415 (1953) (pedophile); Lomax v. District of Columbia, *supra* Note 9 (exhibitionist); and Carras v. District of Columbia, D.C.Mun.App., 183 A.2d 393 (1962) (exhibitionist). From July 1, 1961 through October 30, 1968, 31 persons were committed to St. Elizabeths under the statute. The breakdown as to types of offenses is:

| | |
|---|---|
| Exhibitionism | 16 |
| Pedophilia | 9 |
| Indecent assault (on adult female) | 3 |
| Voyeurism | 1 |
| Homosexuality | 1 |
| Indecent proposals | 1 |

Letter from Dr. Dorothy S. Dobbs, St. Elizabeths Hospital, November 15, 1968.

12. "* * * Dynamic psychiatry sees in paraphilias profound disturbances in the sex life of the person and patterns of sexual behavior not directed ultimately toward procreation, the goal of all normal sex life. The paraphiliac has not matured sexually, having failed to integrate his sexual needs and activities in such a way as to accord with socially accepted modes of sexual expression. He represents a kind of sex life that at an early period of development lost its normal goal, or rather, never having reached it, detoured into aberrant channels leading to an abortive aim-inhibited sexual activity. * * * [T]he behavior is most persistent because it is so close to the instinctive. * * * People suffering from paraphiliac neuro-

Dr. Karpman discussed the term sex psychopath, decrying its general looseness of meaning. Sex psychopaths who exhibit lack of control over compulsive sexual impulses are, he felt, a sub-group within the paraphilias, a group whose aberrant sexual behavior has developed along antisocial routes. He put to one side people who commit isolated abnormal acts, and people whose sexually deviant behavior is the result of situational pressures (*e. g.,* absence of normal sexual objects in the environment). His discussion centered on those individuals whose actions are "an expression of an uncontrollable urge, committed without logic or rationale, under the influence of a strong, overpowering drive." P. 478. Psychiatry views repeated deviation of this sort as "part of a large group of behavior disorders * * *." P. 478.

Dr. Karpman clearly described, under the heading "Chief Characteristics of Sexual Psychopathy," the sick character of such persons, and the need to treat them with established psychiatric techniques:

> " * * * There is little doubt that the reactions that are attributed to sexual psychopaths are beyond the sphere of conscious or voluntary control * * *. As neuroses, they have their specific causations, which may be of long-past origin that only at the moment has manifested itself by the particular sexual violation. Dynamic psychiatry views these reactions as neuroses, which in the fullest sense they are. It ascribes less importance to constitutional or immediate personal factors than it does to functional, deepseated psychogenic emotional factors. For this reason, it has long attempted to cure sexual psychopaths in the same manner as it treats other neurotics. Amazingly enough, many such patients have responded to psychotherapy and actually improved and in some instances were entirely cured, when the specific etiology was uncovered and the person was given the opportunity to discharge

the unhealthy and repressed emotions." P. 483.

For other psychoanalytic explanations of sexual deviation, *see* Friedman, *Sexual Deviations,* in 1 AMERICAN HANDBOOK OF PSYCHIATRY, ch. 29 (1959); Socarides, *Meaning and Content of a Pedophiliac Perversion,* 7 J. of AM. PSYCHOAN. ASS'N 84 (1959).

A classic text in the area is Dr. Clifford Allen's A TEXTBOOK OF PSYCHOSEXUAL DISORDERS (1962). When published in 1962 it was the first textbook of psychosexual diseases, an indication of the recent development of psychiatric learning in this field. Dr. Allen prefaced his text with the statement that "it is felt that psychosexual diseases are now an acceptable part of the corpus of respectable medicine." P. ix. He pointed out that as diseases they should be treated, and felt that "the paraphilias, or psychosexual disorders, are as capable of treatment as any other neuroses." P. 370. Thus the text attempted to "examine sexual abnormality in the same way as any other illness." P. 400.

Among the types of persons discussed are the types who have been committed in the District under the Sexual Psychopath Act. *See* Note 11, *supra.* For example, one chapter is devoted to frotteurism and scoptophilia-exhibitionism, another to infantosexuality (pedophilia). The discussion centers on the psychopathology and treatment of such disorders. Dr. Allen makes clear that they are *mental* disorders. For instance, after a review of the literature he mentions two writers who attempted to "explain exhibitionism on grounds other than psychological," and concludes that "[i]t is obvious that they could not have gone deeply into the patients' psyche—as indeed their paper indicates they failed to do." P. 154.

Studies of sex offenders have referred to the mental disorders of those offenders who are subject to repeated uncontrollable impulses. The need for tradi-

---

ses are driven compulsively to seek gratification of an apparently insatiable urge."

B. KARPMAN, THE SEXUAL OFFENDER AND HIS OFFENSES 479 (1954).

tional psychiatric treatment such as individual and group psychotherapy has been pointed out. *See, e. g.,* J. MOHR., R. TURNER & M. JERRY, PEDOPHILIA AND EXHIBITIONISM (1964); Peters, Pedigo, Steg & McKenna, *Group Psychotherapy of the Sex Offender,* 32 FED. PROBATION 41 (September 1968).

The DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, *supra,* lists "sexual deviation" as a mental disorder. This is defined as:

"individuals whose sexual interests are directed primarily toward objects other than people of the opposite sex, toward sexual acts not usually associated with coitus, or toward coitus performed under bizarre circumstances as in necrophilia, pedophilia, sexual sadism, and fetishism. Even though many find their practices distasteful, they remain unable to substitute normal sexual behavior for them. This diagnosis is not appropriate for individuals who perform deviant sexual acts because normal sexual objects are not available to them." P. 44.

B. *St. Elizabeths Hospital and Maurice Millard*

From July 31, 1961 through October 30, 1968, 31 persons were committed to St. Elizabeths via the Sexual Psychopath Act. The diagnostic breakdown of these 31 persons is:[13]

| | |
|---|---|
| Personality disorder | 26 |
| Neurosis | 2 |
| Chronic brain syndrome | 2 |
| Without mental disorder | 1 |

These data confirm the view that persons validly coming within the statute are mentally disordered. The one exception is accounted for in the draft report by Dr. Dorothy S. Dobbs of St. Elizabeths *(Characteristics of Prisoner-Patients Admitted to Saint Elizabeths Hospital),* at p. 3:

" * * * One patient was found without mental disorder. In this somewhat unusual situation, the judicial determination followed psychiatric examination at D. C. General Hospital; examination here did not reveal sufficient psychopathology to warrant a diagnosis, and, further, the offense probably had no sexual motivation."

Thus the one exception is explainable by the fact that one person was illegally committed. If that person's actions were not sexually motivated, then the statute's requirement of uncontrollable sexual impulses was not met.

Focusing particularly on Maurice Millard, the Government is arguing here that Millard, despite his exhibitionsim, is validly committed and thus is not mentally ill. The St. Elizabeths doctors who testified at Millard's hearing hold a different view.

Millard was diagnosed, and the diagnosis was not challenged by any of the doctors, as a passive-aggressive personality, passive-dependent type—exhibitionism. I note first that personality disorders, and specifically passive-aggressive personality, are listed as mental disorders in the DIAGNOSTIC MANUAL.

Dr. Dale C. Cameron, then Superintendent of St. Elizabeths, testified about Millard as follows:

" * * * He has not fully conpleted his treatment program at the hospital. * * * [W]e are not fully certain that he would not be harmful to others because of his *mental disorder* at this time."

Later the following colloquy took place:

A [by Dr. Cameron] * * * [W]hen he was hospitalized * * * there was an attempt to interrupt the disease process, to stop it. * * *

Q Could you state, precisely, what the disease is which has been interrupted at the hospital?

* * * * * *

A Without going through the entire record, I see * * * the diagnosis "passive-aggressive personality" is carried. * * *

---

13. Letter, *supra* Note 11.

Dr. George Weickhardt of St. Elizabeths described Millard's treatment. He stated that Millard had diagnostic studies, somatic therapy, psychotherapy (individual and group), nursing and ward care, milieu therapy, educational therapy, industrial therapy, patient government, and soon will be tested with grounds privileges. In short, Millard is being given the broad range of treatment offered to most types of mentally ill patients at St. Elizabeths. Dr. Weickhardt, in defending Millard's treatment program, stated "it's like the treatment of any illness * * *."

Dr. Luther D. Robinson, also of St. Elizabeths, described Millard's treatment. He noted that Millard was placed in West Lodge, a general ward with patients who have all sorts of mental problems. No special section is reserved for, and no special type of treatment program is given to, sexual psychopaths. Dr. Robinson testified, as did Dr. Cameron, Dr. Weickhardt and Dr. Michael Miller, that psychotherapy would be a favored treatment. Dr. Robinson participated in the following colloquy:

Q Are you familiar with the clinical diagnosis that has been rendered for Mr. Millard?

A Yes, I am.

Q What is that diagnosis?

A Passive aggressive reaction, passive dependent type—exhibitionism.

Q In the psychiatric terminology, is this diagnosis regarded as a psychiatric illness?

A Yes, it is.

Q Isn't it, rather, a personality disorder?

* * * * * *

A It is a personality disorder but it is a mental illness.

The experience with Millard, and at St. Elizabeths in general, thus confirms the view taken in the literature discussed above. If the statute is construed, as is required, to apply only to repeated sexual offenders who cannot control sexual impulses and thus act on them to the harm of others, it is hardly conceivable that such a person in 1968 could be regarded as other than mentally ill as defined in *McDonald-Alexander*. Thus the District of Columbia Act suffers from a self-destructive internal contradiction—a sex psychopath as defined therein must of necessity be mentally ill—which renders it unenforceable.[14]

14. This disposition makes it unnecessary to reach several constitutional issues which trouble the statute. First, as noted *supra* at Note 6, if the "not insane" provision of the statute is taken in its old meaning, the Act would apply to some mentally ill persons, raising equal protection problems.

Second, when construed as excluding mentally ill persons, the statute's purpose becomes to a great degree preventive detention. There is a grave problem, as Judge Bazelon notes, whether for non-sick individuals "the state can ever confine a citizen against his will simply because he is likely to be dangerous in the future." And even without reaching this issue, it is clear that such commitment would be constitutionally suspect if it could be instituted without the full measure of safeguards afforded a defendant in a criminal proceeding. The statute, in § 3508, provides that a person has a right to a jury, and to a hearing at which "[t]he rules of evidence applicable in judicial proceedings in the court" apply, but it is not clear whether this includes the full protection against self-incrimination and the complete right of confrontation. Without them the statute's constitutionality would be precarious.

Finally, the statute may be vulnerable to an attack as vague. The Supreme Court, in *Pearson, supra* Note 3, avoided this claim by construing the act to apply only to those who utterly lack the power to control repeated sexual impulses and who are therefore likely to inflict substantial harm on their victims. However, this is the construction we have found to be equated with mental illness. A lesser construction would thus reopen the vagueness issue. Further, the void-for-vagueness doctrine has come a long way since the *Pearson* case was decided in 1940, as has the state of knowledge regarding sexual behavior. There are appropriate occasions when a court can, in light of increasing knowledge and legal doctrine, question the validity of an old decision of that court or of a higher court. *See* England v. Louisiana State Board of Medical

## IV

Declaring the District of Columbia Sexual Psychopath Act unenforceable does not mean that society's hands are tied in dealing with the problem. The contrary is true. There are presently available two clear channels through which sex offenders can be dealt with. Those whose actions are isolated acts or the product of controllable urges can be prosecuted under a variety of criminal statutes, depending upon the nature of the act. The others, those who are subject to repeated impulses and drives which they are powerless to check, can, if they pose a danger to society, be committed under the general civil commitment statute.[15]

In sum, the alternatives to the Sexual Psychopath Act cover the field, rendering the statute needless. The statute's forced isolation of one aspect of a person's personality makes it psychiatrically artificial. The statute may run afoul of the Constitution in several respects. And finally, the statute's own definition of sex psychopath has been pressed into a self-contradictory and meaningless pulp by the expansion of medical and legal thought over the past 20 years.

WILBUR K. MILLER, Senior Circuit Judge, dissents.

Examiners, 5 Cir., 259 F.2d 626 (1958), *on petition for rehearing*, 263 F.2d 661, *cert. denied*, 359 U.S. 1012, 79 S.Ct. 1149, 3 L.Ed.2d 1036 (1959) ; Dawson v. Mayor and City Council of Baltimore City, 4 Cir., 220 F.2d 386, *cert. denied*, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955). It may be that a renewed attack on the statute, even as construed in *Pearson*, would successfully fell it as too vague to authorize commitment.

15. The issue of dangerousness, as Judge Bazelon notes, is a barrier on which this statute has been foundering. The statute requires that the harm focused on as the prerequisite for commitment be that caused by the person's sexual activities. By focusing on a particular aspect of the person, the statute forces psychiatrists into a sterile attempt to isolate a part of a person's behavior from his total personality.

The doctors here were unable to do this. It is folly to have expected them to. As Dr. Winfred Overholser, former Superintendent of St. Elizabeths Hospital, stated in 1947, the year before the Sexual Psychopath Act was enacted :

"If sex relations were merely the satisfaction of a physical urge, as they are in animals, the matter might be different; but in people the sex function is so tied up with emotion, so much at the mercy of thoughts, beliefs, prejudices, taboos and superstitions, that in very many instances the instinct itself cannot function in a normal manner. The whole personality is involved, not merely the sexual function."

W. OVERHOLSER & W. RICHMOND, HANDBOOK OF PSYCHIATRY 19 (1947).

Yet the statute clearly viewed sexual psychopathy as a psychiatric problem. Sections 3506 and 3507 require that two psychiatrists examine the person and it is their reports which form the basis on which his commitment hearing proceeds. This supports the view that the problems the statute deals with should be seen in the broader context of mental illness, a context in which psychiatrists can make meaningful estimates about a person based on an integrated view of his whole personality.