In re Hatley

---

IN RE: MARY ALBERTA HATLEY

No. 7515DC762

(Filed 18 August 1976)

**1. Insane Persons § 1— involuntary commitment — required findings**
 Prerequisite to a valid involuntary commitment to a mental health care facility, G.S. 122-58.7(i) mandates that the district court make

.

two distinct findings: (1) that the respondent is mentally ill or inebriate as those terms are defined in G.S. 122-36, and (2) that the respondent is imminently dangerous to himself or others.

2. **Insane Persons § 1— careless and reckless driving — respondent imminently dangerous to herself or others**

Evidence that respondent drove her car carelessly and recklessly was sufficient to support the trial court's determination that respondent was imminently dangerous to herself or others.

Judge MORRIS dissenting.

APPEAL by respondent from *Paschal, Judge.* Judgment entered 4 August 1975 in District Court, ORANGE County. Heard in the Court of Appeals 20 January 1976.

This is a proceeding for involuntary commitment to a mental health facility pursuant to Ch. 122, Article 5A, of the General Statutes.

On 25 July 1975 respondent's mother submitted a sworn petition alleging that her daughter, Mary Alberta Hatley, was mentally ill and imminently dangerous to herself or others. She based her opinion on respondent's erratic behavior, her threatening a relative with a brick, driving an automobile carelessly and recklessly, her inability at times to communicate with others, her failure to react normally in "caring for herself," and being "out of contact with reality."

A magistrate ordered that respondent be taken into custody for purpose of being examined by a qualified physician. Pursuant to the order, respondent was examined by Dr. Tom Wilson, a physician at North Carolina Memorial Hospital in Chapel Hill. He concluded that respondent was mentally ill and imminently dangerous to herself or others and recommended that she be committed to John Umstead Hospital.

At Umstead Hospital, respondent was examined by Dr. M. Elmaghraby, a physician, who confirmed Dr. Wilson's opinion and recommended that she be hospitalized for medication and rehabilitation.

On 4 August 1975 a hearing was held on the petition in district court. After receiving evidence from the petitioner, (the respondent offering no evidence) and considering the medical reports, the court made findings of fact and ordered that respondent be committed to Umstead Hospital for a period not to exceed 90 days.

---

---

Respondent appealed.

*Attorney General Edmisten, by Isaac T. Avery III, for the State.*

*Jerry P. Davenport for respondent appellant.*

BRITT, Judge.

G.S. 122-58.7(i) provides:

"To support a commitment order, the court is required to find, by clear, cogent, and convincing evidence, that the respondent is mentally ill or inebriate, and imminently dangerous to himself or others. The court shall record the facts which support its findings."

[1]  Prerequisite to a valid commitment the quoted statute mandates that the district court make two distinct findings: (1) that the respondent is mentally ill or inebriate as those terms are defined in G.S. 122-36, and (2) that the respondent is "imminently dangerous to himself or others." *In re Carter,* 25 N.C. App. 442, 213 S.E. 2d 409 (1975).

[2]  In the case at hand, the district court found and concluded that respondent was mentally ill and there is no exception to that finding and conclusion. Respondent's only exception is to the finding that she was imminently dangerous to others "without there being any evidence that there was a recent overt act, attempt or threat."

The district court's finding No. 7 is as follows:

"7. That based on the evidence the Court finds that the respondent is imminently dangerous to herself in that she was driving in a careless and reckless manner such that the lives of persons with whom she came in contact might or could be endangered and in that she entered a house at a time when that house was not physically present [sic] by that neighbor who usually occupied the house."

In her testimony, after stating that respondent was born in 1943 and had been treated in mental institutions on several occasions, respondent's mother testified that " . . . [s]he could be a danger in that when she is driving a car in the condition that she is currently in, she may operate the car as in a way to endanger others on the road. And she has been driving her car

recently." On cross-examination she testified that respondent drove carelessly and dangerously in that when "backing up" she would not look over her shoulder as she should and would "back up" too fast. She further testified that when driving respondent would not "make the proper sign."

We think the court's finding, however inartfully stated, that respondent was imminently dangerous to herself and others was adequately supported by the evidence relating to her driving an automobile. Needless to say, an automobile driven by an incompetent driver can be a lethal instrumentality, a real danger to the driver and other people on the highway.

Respondent insists that to be valid a finding that one is imminently dangerous to herself or others must be based on evidence showing a recent overt act, attempt or threat and that such evidence was lacking in this case. Assuming, *arguendo*, that respondent's argument is correct, we think there *was* evidence of an overt act, namely, the improper operation of an automobile.

It will be noted that respondent does not challenge the determination that she was mentally ill. It could be persuasively argued that the mere operation of an automobile on a public highway by a mentally ill person constitutes an overt act imminently dangerous to the driver and others. Here, the evidence not only showed that respondent was driving her car but that she was driving carelessly and dangerously.

The judgment is

Affirmed.

Chief Judge BROCK concurs.

Judge MORRIS dissents.

Judge MORRIS dissenting.

Respondent, involuntarily committed to a State mental institution, contends that the District Court, proceeding without benefit of clear, cogent and convincing evidence, erred in entering its commitment order. I am constrained to agree.

There is no question that civil commitment is a drastic and critical intervention by the State into the private affairs

of its citizenry. See: Livermore, et al, "On the Justifications for Civil Commitment," 117 U. Pa. Law Rev. 75-96 (1968). Consequently, our Legislature carefully limited the scope and range of behavior appropriate for involuntary commitment and provided at the outset of Chapter 122, Article 5A of our General Statutes " . . . that no person shall be committed . . . unless he is mentally ill or an inebriate *and* imminently dangerous to himself or others; that a commitment will be accomplished under conditions that protect the dignity and constitutional rights of the person; and that committed persons will be discharged as soon as a less restrictive mode of treatment is appropriate." (Emphasis supplied.) G.S. 122-58.1.

The Legislature further provided that judicial commitment orders must be supported by clear, cogent and convincing evidence. Without such evidence, and the requisite supporting findings of fact, no commitment can lawfully issue. See: G.S. 122-58.7(i).

Finally, the General Assembly, amplifying on this basic process, defined the fundamentally important terms:

"§ 122-58.2 *Definitions.*—As used in this Article: (1) The phrase 'dangerous to himself' includes, but is not limited to, those mentally ill or inebriate persons who are unable to provide for their basic needs for food, clothing, or shelter; (2) The words 'inebriety' and 'mental illness' have the same meaning as they are given in G.S. 122-36 . . . "

"§ 122-36. *Definitions.*— . . .

(d) The words 'mental illness' shall mean an illness which so lessens the capacity of the person to use his customary self-control, judgment, and discretion in the conduct of his affairs, and social relations as to make it necessary or advisable for him to be under treatment, care, supervision, guidance, or control. The words 'mentally ill' shall mean a person with a mental illness."

G.S. 122-58.7(i) provides that "[t]o support a commitment order, the court is required to find, by clear, cogent, and convincing evidence, that the respondent is *mentally ill or inebriate and imminently dangerous to himself or others.* The court shall record the facts which support its findings." (Emphasis supplied.)

In view of these overriding statutory guidelines, I am of the opinion that the District Court's commitment order must be vacated. There is no question but that respondent experienced mental illness in the past and that the mental condition adversely affected both respondent's life and the lives of those individuals personally involved with the respondent. Arguably, respondent may have exhibited certain signs of mental illness at the time of the District Court hearing. However, in my opinion there is not sufficient clear, cogent and convincing evidence indicating that respondent was either mentally ill or imminently dangerous. More specifically, this record is devoid of any evidence either showing or tending to show that respondent was unable to provide for her own needs. Respondent's perception of reality and her overall conception of her situation in life may have been, and may still be, burdened by psychologically-based infirmities, but this unfortunate condition did not warrant a finding that she was dangerous to herself or others.

As indicated above, the critical problem in this case is not related to the question of mental illness, but to the more intangible question of whether respondent is in fact "dangerous" to herself or others, within the meaning of the statute.

I am aware of the considerable criticism leveled against the "dangerous" standard and the various suggestions for reform that have been advanced in recent years. See: *Livermore, et al, supra; Peszke,* "Is Dangerousness an Issue for Physicians in Emergency Commitments?" American Journal of Psychiatry, 132:8 pp. 825-828 and Comment by Stone at pp. 829-832 (Aug. 1975); Dershowitz, "Psychiatry in the Legal Process: A Knife that Cuts Both Ways." 4 Trial 29-33, (Feb.-March 1968). However, notwithstanding this criticism, it appears that the "dangerous" standard has been and continues to be an essential element in the commitment process. See: Brakel and Rock, The Mentally Disabled and the Law (Revised ed. 1971); 92 A.L.R. 2d 570, "Right, Without Judicial Proceeding to Arrest and Detain One Who is, or is Suspected of Being, Mentally Deranged"; 44 C.J.S., Insane Persons, §§ 64 et seq. Also see *O'Connor v. Donaldson,* 422 U.S. 563, 45 L.Ed. 2d 396, 95 S.Ct. 2486 (1975) (especially concurring opinion of Burger, C.J.); *Cross v. Harris,* 418 F. 2d 1095 (D.C. Cir. 1969); *Millard v. Harris,* 406 F. 2d 964 (D.C. Cir. 1968).

Certainly "dangerousness" is, as the critics suggest, potentially an imprecise measurement of human behavior. To clarify

its meaning and to retain its validity as a measuring device, the courts must consider the issue of dangerousness on a case-by-case basis with special emphasis on the likelihood of harm. As one court has stated:

" . . . [T]he State must balance the curtailment of liberty against the danger of harm to the individual or others. The paramount factor is the interest of society which naturally includes the interest of the patient in not being subjected to unjustified confinement. . . . [T]he 'science' of predicting future dangerous behavior is inexact, and certainly is not infallible. . . . [T]he mere establishment of a mental problem is not an adequate basis upon which to confine a person who has never harmed or attempted to harm either himself or another. However, we are of the opinion that a decision to commit based upon a medical opinion which clearly states that a person is *reasonably expected to engage in dangerous conduct, and which is based upon the experience and studies of qualified psychiatrists,* is a determination which properly can be made by the State." *People v. Sansone,* 18 Ill. App. 3d 315, 309 N.E. 2d 733, 739 (1974). (Emphasis supplied.)

In short, the State must balance its duty to protect its citizens from harm against the right of any one person to be free from restraint and interference barring conviction of the commission of a crime. This balance, however, should tilt in favor of involuntary commitment when it can be shown by clear, cogent and convincing evidence that the mentally ill or inebriate respondent is incapable of " . . . surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson,* 45 L.Ed. 2d, at 407. Underlying this entire process is the humanistic consideration that both the individual respondent and society would be better off if a commitment order would issue.

This is obviously a situation where respondent's family would be more comfortable if respondent were institutionalized. However, the evidence that "she *could* be a danger in that when she is driving a car in the condition that she is currently in, she *may* operate the car in a way to endanger others on the road, and she has been driving her car recently" is not the clear, cogent, and convincing evidence required by the statute. Nor does the evidence elicited on cross-examination that respondent

drove carelessly and dangerously in that when "backing up" she would not look over her shoulder as she should and would "back up" too fast, or would not "make the proper sign," measure up to the required standard. If this type of evidence were sufficient to support a finding that a respondent is imminently dangerous to herself or others, I fear many of us sometimes engage in conduct which would support such a finding if commitment proceedings were begun. While I sympathize with the family and friends and neighbors of persons whose erratic behavior creates real problems in the home and community, I do not interpret the statute, as written, as affording the relief sought in this situation. I do not think the evidence is sufficient to support a finding or conclusion that respondent is imminently dangerous to herself or others.

I would vote to vacate the judgment.